UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

WARREN TAYLOR,

                Plaintiff,           01 Civ. 2566 (RWS)

    - against -            OPINION

GARY F. HODGES,

                Defendant.

------------------------------------------X

A P P E A R A N C E S:



    PRO SE

    WARREN TAYLOR
    # 96-A-6292
    Gowanda Correctional Facility
    P.O. Box 311
    Gowanda, N.Y.  14070


    Attorneys for Defendant

    HONORABLE ROBERT T. JOHNSON
    District Attorney, Bronx County
    198 East 161st Street
    Bronx, N.Y. 10451
    By: NANCY D. KILLIAN, ESQ.
        Assistant District Attorney

**Sweet, D.J.,**

Warren Taylor ("Taylor" or "Petitioner") has brought this Petition for habeas corpus pursuant to 28 U.S.C. § 2254, alleging he is being held in state custody in violation of his federal constitutional rights. For the reasons set forth below, the Petition is dismissed.

## I. PRIOR PROCEEDINGS

Taylor's state custody arises from a judgment of conviction entered on September 11, 1996, in New York State Supreme Court, Bronx County, convicting him after a jury trial of Manslaughter in the First Degree under New York Penal Law § 125.20, and sentencing him to an indeterminate term of imprisonment from eight and one third to twenty-five years.

Taylor appealed to the Appellate Division, First Department, with the assistance of counsel, arguing that (1) the trial court improperly permitted the sworn testimony of a child witness; (2) there was insufficient evidence of guilt; (3) the trial court should have imposed sanctions based on alleged delays in discovery; (4) petitioner's belt was improperly admitted into evidence; and (5) the trial court should have

rendered a circumstantial evidence charge. See Killian Aff. in Support of Mot. to Dismiss, Ex. 1.

On November 6, 1997, the First Department affirmed Petitioner's conviction, holding that the child witness was properly permitted to offer sworn testimony, the verdict was based on legally sufficient evidence, questions of credibility were properly presented to the jury, and that Petitioner's other arguments were unpreserved and without merit. People v. Taylor, 663 N.Y.S.2d 848 (App. Div. 1997).

On January 13, 1998, Petitioner's application for leave to appeal to the New York Court of Appeals was denied. People v. Taylor, 91 N.Y.2d 898 (Table) (N.Y. 1998).

On April 23, 1998, Petitioner filed an application for a writ of *coram nobis* with the Appellate Division alleging that his appellate counsel was ineffective for failing to raise a claim of ineffective trial counsel on direct appeal. The application was denied on July 16, 1998. People v. Taylor, 677 N.Y.S.2d 227 (Table) (App. Div. 1998).

By papers dated March 26, 1999, Petitioner filed with the trial court a motion to vacate his judgment of conviction

2

pursuant to N.Y. Crim. Proc. Law § 440.10, on the basis of
ineffective assistance of trial counsel. Petitioner argued that
trial counsel had failed to preserve a variety of issues, some
of which were addressed in Petitioner's November 6 appeal. The
motion was denied on February 23, 2000. See Killian Aff., Ex.
10. The trial court noted that trial counsel's failure to
preserve the issues raised on appeal would not have prevented
the reviewing court from considering them in the absence of
preservation had there not been overwhelming evidence of the
defendant's guilt. Id. at 2. The trial court also stated that
were it to consider the merits of Petitioner's claim
notwithstanding the procedural bars, the motion would be denied,
as the record indicated that Petitioner was provided with
meaningful representation. Id. The Appellate Division denied
leave to appeal this decision on July 6, 2000. See id., Ex. 11.

By a Petition dated February 1, 2001, Taylor applied
for habeas corpus through the Pro Se Office of this Court.
Taylor asserts four claims for habeas relief: (1) he was denied
a fair trial when the trial court did not sanction the People
for late disclosure of discovery material; (2) the evidence of
guilt was legally insufficient; (3) he was entitled to a
circumstantial evidence charge; (4) his belt was improperly
admitted into evidence.

On March 26, 2001, this Court directed Petitioner to show cause why his Petition should not be dismissed as time-barred. On April 26, 2001, Petitioner filed an affirmation stating that he had not received the July 6, 2000 decision of the Appellate Division until receiving a letter post-marked January 27, 2001.

On August 9, 2001, Gary Hodges ("Hodges" or the "Respondent") moved to dismiss the Petition as time-barred. On November 29, 2001, this Court granted Respondent's motion to dismiss.

On December 24, 2001, Petitioner applied for a certificate of appealability from the Court of Appeals for the Second Circuit. Over four years later, on April 24, 2006, the Court of Appeals issued a certificate of appealability, and, by a decision dated January 25, 2008, found that Petitioner was entitled to equitable tolling, based on his claim that six months had elapsed before he received notice that his application for leave to appeal from the Appellate Division had been denied. With the benefit of equitable tolling, the Petition was considered timely. The Court of Appeals therefore

4

reversed and remanded for consideration of the Petition on the merits. Taylor v. Hodges, 515 F.3d 149 (2d Cir. 2008).

Respondent submitted his opposition to the Petition on April 29, 2008.

## II. FACTUAL BACKGROUND

In March of 1994, Donna Pearman lived at apartment 4A at 603 Morris Avenue with petitioner (her boyfriend), their natural daughter (three year-old Chelnecia "Che-Che" Taylor) and four foster children: Roema Williams (three months old), Michael Saunders (three years old), Clarisse Funderburk (four and one half years old), and Pierre Funderburk (three years old). Roema was a "drug addicted baby" and Michael could not speak or "go to the bathroom." Trial Tr. 52-57 (Pearman). If any of the children misbehaved, he or she was put in a corner or sent to his or her room. Pearman never struck the children nor did she ever observe Petitioner hit them. Id. 60-61; 160-61; 171-72.

Pearman informed the foster agency, as soon as she received Clarisse and Pierre, that she observed scars on their bodies and that the children told her "lots of times" that their former foster mother, Denise Jamison, beat them with a belt and

5

instructed them not to tell anyone. Id. 112-13; 121-23; 192-93. In September 1994, Pearman brought the children to the clinic at the foster agency because she noticed belt marks on their bodies. At the time, Pearman believed the marks were caused by Jamison.

On December 19, 1994, Pearman woke at 5:45 a.m. to fix Che Che's lunch, as she did every morning before taking the child to nursery school. Petitioner, who was sleeping on the living room sofa, dressed only in shorts and a t-shirt, awoke and went to lie down in the bedroom that he normally shared with Pearman, Che Che and Roema, who slept in a crib. At 6:15 a.m., Pearman heard Clarisse and Pierre "playing and jumping around," "making noise" in the second bedroom they shared. The children were jumping from boxes on the floor to their beds, which they often did. Id. at 61-62; 67; 104-06; 130-32; 146-47; 149; 198-99.

Ms. Pearman fed Clarisse and Pierre, washed their faces, changed their undergarments, kissed them and sent them back to bed. Their physical condition at this time was "fine." Id. at 65-66. Ms. Pearman woke up Che Che at 7:00 a.m. and prepared her for school. At 7:25 a.m., Che Che gave Petitioner

6

a kiss and left the apartment with her mother. Id. at 67-68;
105.

When their foster mother left, Clarisse and Pierre
were still lying in their beds, talking to each other. "Warren"
(Clarisse could not identify Petitioner in court, referring to
him as "Warren" throughout her testimony) believed that Clarisse
and Pierre were making noise and entered the children's bedroom
and "hit Pierre a lot of times" with a black belt that had a
"gold goat on it." Warren took Pierre into the other bedroom,
hit him with the belt "a lot" more times and then placed him in
the crib. Id. at 548-52; 579 (Funderburk). Once Pierre was
quiet, Warren removed him from the crib and put him back in his
bed, "on his tummy." Id. at 552-53. Warren then took Clarisse,
brought her into the other bedroom and struck her with the belt
once on her back. Id. at 549; 553; 575; 579-80. Clarisse fell
off the bed and hit the floor, causing a bump to her forehead.
Id. at 554-55. After he finished hitting the children, Warren
dressed and left the apartment. Id. at 549; 555.

In the meantime, Pearman and Che Che walked the eight
blocks to the nursery school, taking almost twenty-five minutes
to get there. Upon their arrival at about 7:50 a.m., Pearman
learned that the fruit that she and her sister, Juanita Powell,

7

had ordered from a teacher had arrived. Id. at 69-71; 105 (Pearman); 206; 209; 223 (Powell). Pearman telephoned her sister several times because she wanted her to collect the fruit or loan Pearman a shopping cart so that she could take her fruit home. Since she could not get in touch with her sister, Pearman borrowed the teacher's shopping cart and left the school at about 8:50 a.m., an hour after she had arrived. Id. at 71-74 (Pearman).

Petitioner returned home before Pearman. When Pearman arrived, at approximately 9:15, he was fully clothed, wearing a jacket and ski hat, and sat in a dining room chair. Then Petitioner stood up, "pushed past" the shopping cart, left the apartment without saying a word and went down the stairs that led to the elevator. Id. at 75-78 (Pearman); 229-30 (Powell); 555-56 (Funderburk).

As Pearman started to clean the dishes, Powell called and arranged to collect her fruit. Powell arrived at Pearman's house somewhere between 9:20 and 10:00 a.m. Id. at 79-81; 107-08 (Pearman); 210-11; 227-28; 240; 243; 593-94 (Powell). After about thirty minutes, Clarisse "peeked" into the room, and Pearman told her to get her clothes. Once she dressed Clarisse, Pearman went to check on Pierre, who was lying still in the bed

8

with a sheet covering his head. Id. at 82-86; 108-10 (Pearman); 211-12; 243; 594-96 (Powell).

When Pearman pulled the sheet down, she noticed that Pierre had black and blue marks on his face and legs; and his mouth was purple. Id. at 86-89 (Pearman); 556 (Funderburk). The child's eyes and mouth were open but he was not breathing. Id. at 88; 90 (Pearman); 213; 215 (Powell). Pearman picked him up, "started screaming and hollering," grabbed the telephone and dialed 911. Id. at 87; 135-36 (Pearman); 213-14; 248 (Powell); 556 (Funderburk).

Powell was performing CPR on Pierre when the police arrived, sometime between 10:53 and 11:00 a.m. Police Officer James Treadwell picked up Pierre and rushed him down the stairs and into an ambulance. Id. at 90-91; 114; 154-55 (Pearman); 214-16 (Powell); 525-27; 539 (Treadwell); 558-59 (Funderburk). Officer Treadwell noticed that Pierre's mouth was open and that there was dried blood on his tongue and nose. Id. at 525-26 (Treadwell). The child was dead on arrival at Lincoln Hospital. Id. at 161-62 (Pearman).

At approximately 11:05 a.m. on December 19, Detective John Pegram went to Lincoln Hospital to examine the victim's

9

body. The detective noticed bruises on the child's face and
that he was struck in the mouth. Id. at 257-59; 262; 266-67;
311; 316 (Pegram). Photographs admitted into evidence as
People's Exhibits 1 through 5 showed that the child was beaten
about his back and buttocks, as if he had received a "lashing."
Id. at 260-63; 265; 268-69 (Pegram).

After speaking with Pearman, Detectives Pegram and
Martino went to 603 Morris Avenue to examine the crime scene.
Id. at 92-93 (Pearman); 271-72; 318-19 (Pegram). Photographs of
the apartment, including a photograph of Pierre's bedroom, which
depicted "blood splattering [sic] spots on the floor," were
admitted into evidence as Exhibits 8a through 9c. Id. at 275-78
(Pegram). The detectives then proceeded to the residence of
"Charlie Brown," Petitioner's friend, on the advice of Pearman.
When they entered Brown's residence, they discovered Petitioner
asleep on the sofa. Id. at 113-14; 183-84 (Pearman); 281-83;
329-30 (Pegram).

Petitioner accompanied the detectives to the 40th
Precinct, where he was interviewed by Detective Julio Colon.
Petitioner told Detective Colon that he was awoken by "Che Che"
at about 7:30 a.m., but once she left for school, he fell
asleep. When he woke again, he did not "hear any of the kids in

10

the house." He proceeded to Charlie's house where he fell
asleep on the sofa. The "next thing" he knew, a detective woke
him up. Id. at 283 (Pegram); 368-69; 382-83 (Colon).
Petitioner said that on occasion he would slap the children to
reprimand them. Id. at 401-02 (Colon). Detective Colon removed
a belt with a "ram's head buckle" from Petitioner's waist and
vouchered it. Id. at 383-84; 387-88. The belt was admitted
into evidence as People's Exhibit 13. Id. at 387.

At approximately 3:15 p.m. on December 19, Detective
Pegram returned to Lincoln Hospital to examine Clarisse
Funderburk. He observed a large bump on her forehead, encrusted
with dried blood, and as photographs showed, numerous "lashings"
or "lash marks" about her body. Given the U-shaped nature of
the bruises, it was "obvious" that Clarisse had been beaten with
a belt. Id. at 284-86; 289-95; 334-35 (Pegram). In addition,
the mark of a belt buckle was "indented in one of her legs."
Id. at 286; 294; 306. Clarisse told the detective how she and
Pierre were injured. Id. at 295-96.

At the 40th Precinct, Pearman told police that
Petitioner owned a belt with a "ram" on it, but that he did not
beat the children with it. Id. at 157-58 (Pearman). She denied
telling them that Petitioner beat her as well. Id. at 158; 170-

11

71; 194-95. When Pearman saw Petitioner at the precinct she asked him "why," but he did not respond. Id. at 97-98.

On December 20, 1994, expert pathologist Dr. Zoya Schmuter performed an autopsy on Pierre. As depicted by the five autopsy slides admitted into evidence as People's Exhibit 17, the child sustained "fresh" bruises and abrasions on both sides of his face, the left side of his neck and the left side of his hip. The bruises on his hip were "consolidated," occupying an area five-by-three inches in size. In addition, the victim had an "old" scar on his forehead. Id. at 404; 409-12; 455-56; 467; 484-85 (Schmuter).

After conducting an external examination, the doctor detected at least ten areas of bleeding beneath the skin of the victim's head, an area of impact. The soft tissue underlying the victim's hip and the tissue surrounding his adrenal glands and right kidney were bleeding as well. The child's abdominal cavity contained five hundred millileters of liquid and clotted blood resulting from two lacerations to the liver. Id. at 412-13; 467. The liver was healthy except for the lacerations. Id. at 413. Dr. Schmuter concluded that Pierre died as a result of abdominal bleeding due to liver lacerations and blunt impact trauma to the head. Id. at 413; 425-26; 477. The fatal blows

12

were consistent with the victim being hit with a belt. Id. at
478-79. While there was a "possibility" that a child could
lacerate his liver accidentally, Pierre's injuries were
consistent with a beating. Id. at 426-27; 461.

Dr. Schmuter noticed that Pierre's stomach contained
approximately 300 grams of digested food consistent with cereal.
His stomach would have been empty three or four hours after he
ate. The presence of digested food in Pierre's stomach
indicated that he ate approximately one hour, but no more than
two hours before he slipped into a coma or died. Id. at 414-17;
419; 421; 424-25; 480.

**The Defense**

NYNEX employee Kevin Houston testified that, on
December 19, 1994, only three phone calls were made from
Petitioner's telephone to 665-6582. The first call was made at
6:14 a.m., the second at 9:38 a.m., and the third at 10:35 a.m.
However, the phone records would not indicate whether any 911
calls were made that day. Id. at 600-03 (Houston).

Detective Michael Febbraro interviewed Donna Pearman
on December 19, 1994, at approximately 5:26 p.m. Pearman told

13

the detective that at 7:00 a.m. that morning, Petitioner struck
her during an argument, but she did not seek medical attention.
Id. at 620-21 (Febbraro).

On December 19, 1994, Detective Linda Palacios spoke
with Juanita Powell. Powell stated that she arrived at her
sister's apartment at approximately 9:30 a.m. that morning and
that, shortly thereafter, her sister "came out of the bedroom
screaming that the baby was not breathing." Id. at 627; 634-35;
637-38 (Palacios). Powell did not tell the detective under what
circumstances Petitioner left the apartment, only that he
"wasn't in the apartment." Id. at 635.

## III. STANDARD OF REVIEW

Under 28 U.S.C. § 2254(a), the federal courts have
jurisdiction to hear applications for a writ of habeas corpus
"in behalf of a person in custody pursuant to the judgment of a
State court only on the ground that he is in custody in
violation of the Constitution or laws or treaties of the United
States." However,

    [a] federal court may not grant habeas relief to
    a state prisoner "with respect to any claim that
    was adjudicated on the merits in State court . .
    . unless the adjudication of the claim . . .
    resulted in a decision that was contrary to, or

14

involved an unreasonable application of, clearly
established Federal law, as determined by the
Supreme Court of the United States," or "was
based on an unreasonable determination of the
facts in light of the evidence presented in the
State court proceeding."

28 U.S.C. § 2254(d); Davis v. Grant, 532 F.3d 132, 140 (2d Cir.
2008).

## IV. DISCUSSION

### A. The Trial Court's Failure to Sanction the People for Evidentiary Violations Did Not Violate Due Process

Petitioner first argues that he was denied a fair

trial, in violation of the due process clause of the Fourteenth

Amendment, when the trial court did not sanction the People for

late disclosure of discovery materials: specifically, (1) the

medical examiner's autopsy slides, (2) crime scene photographs,

and (3) forms requesting laboratory analysis of evidence

recovered from the crime scene.

#### 1. Autopsy Slides

Petitioner asserts that the autopsy slides constitute

Brady material to the extent that they might have revealed that

some of the markings on the victim's body pre-dated December 19,

1994, had Petitioner been given an opportunity to have them examined by his own medical expert.

The Appellate Division summarily rejected this argument as unpreserved and without merit. See People v. Taylor, 663 N.Y.S.2d at 848. Where a Petitioner has failed to preserve an objection, "the conviction stands on an adequate and independent state ground that bars review of the merits by a habeas court, unless the petitioner can show cause for and prejudice resulting from her failure to object in the state proceedings." Cruz v. Scully, 716 F. Supp. 766, 768 (S.D.N.Y. 1989); see Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977); Ramirez v. Attorney General of State of N.Y., 280 F.3d 87, 94 (2d Cir. 2001). Petitioner may also be able to obtain habeas relief "if he can demonstrate that denial of such relief would result in a fundamental miscarriage of justice due to his actual innocence." Tavarez v. New York, 2008 WL 2775810, at *3 (S.D.N.Y. July 14, 2008); see Dretke v. Haley, 541 U.S. 386, 394 (2004).

Whether Taylor failed to preserve his objection to the belated production of the autopsy photographs is a close question. New York Criminal Procedure Law § 470.05 states, in relevant part, that

a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.

N.Y. Crim. Proc. Law § 470.05 (McKinney 1994). The trial transcript indicates that when the existence of the autopsy slides was revealed (on cross-examination of the state medical examiner by defense counsel), defense counsel stated, "Judge, I believe I have a motion," and the court immediately excused the jury and reprimanded the district attorney in strong language. See Trial Tr. 429-430 ("I don't mind telling you, Mr. Ross, I am outraged at the manner in which you did this case. It is a disaster and a shame for the district attorney's office to proceed in a manner such as you have elected to proceed. Just outrageous."). The court then addressed a number of evidentiary issues. As to the slides, the court stated:

that the district attorney never bothered getting photographs of the autopsy it is mind boggling, if they fail to produce it on Monday morning at ten AM sharp when this witness will retake the witness stand that's all right with me too. I will then grant you an adverse inference that if the photographs ---- tomorrow, not Monday, tomorrow ---- then I will also entertain an application for an adverse inference that if the photographs were produced they would have been favorable to the defendant and unfavorable to the prosecution. I will grant that relief for you if that's what you seek.

Id. at 433-34. Counsel for the defendant agreed to these terms,
and did not seek further relief. There were several subsequent
colloquies with regard to the slides, but at no time did defense
counsel request further relief, nor is there any indication that
counsel was prevented from doing so. See id. at 446-48; 472-73;
469-70. In fact, defense counsel was offered an opportunity to
discuss the slides with the medical examiner prior to proceeding
with his cross-examination, which he declined. Id. at 447-48.
Thus, counsel for Petitioner did raise an objection, but it
appears from the record that the objection was successful and
that Petitioner did not seek further relief.

However, even assuming that an objection was
preserved, Petitioner has failed to establish a Brady violation.
Under Brady, "to the extent that a prosecutor knows of material
evidence favorable to the defendant in a criminal prosecution,
the government has a due process obligation grounded in the 14th
Amendment to disclose that evidence to the defendant." DiSimone
v. Phillips, 461 F.3d 181, 192 (2d Cir. 2006) (quotation and
alterations omitted). To amount to a Brady violation, " [t]he
evidence at issue must be favorable to the accused, either
because it is exculpatory, or because it is impeaching; that
evidence must have been suppressed by the State, either

willfully or inadvertently; and prejudice must have ensued."
Id. (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).
See also Brady v. Maryland, 373 U.S. 83, 87 (1963); United
States v. Agurs, 427 U.S. 97 (1976) (extending Brady doctrine to
cases in which defendant failed to request disclosure).

Petitioner has failed to establish that the slides are
material — i.e., that defendant suffered prejudice when they
were withheld. Evidence is material only if there is a
reasonable probability that, had the evidence been disclosed to
the defense, the result of the proceeding would have been
different.  United States v. Bagley, 473 U.S. 667 (1985); United
States v. Jackson, 345 F.3d 59, 73 (2d Cir. 2003).  A
"reasonable probability" is a probability sufficient to
undermine confidence in the outcome.  Bagley, 473 U.S. at 682;
United States v. Madori, 419 F.3d 159, 169 (2d Cir. 2005).
Petitioner's speculation that the slides might have revealed
that some of the markings on the victim's body pre-dated
December 19, 1994, and his assertions that earlier production of
the slides would have given him the opportunity to "have the
autopsy slides reviewed by his medical expert to determine the
nature and antiquity of all markings on decedent's body" and
"would have also enabled defense counsel to familiarize himself
with the subject matter at hand, and would have assisted counsel

in the cross-examination of the People's expert witness,"
Petitioner Mem. 24, are insufficient to cast doubt on the
outcome of the case in light of the "ample evidence" supporting
the verdict. See People v. Taylor, 663 N.Y.S.2d at 848.

## 2. Crime Scene Photographs

Photographs of the crime scene admitted into evidence
as exhibits during the testimony of Detective Pegram were first
produced to defense counsel when the detective took the stand.
Petitioner argues that the trial court should have precluded
these photographs, or at least offered the defense a continuance
in order to properly prepare to cross-examine Detective Pegram
and have the photographs examined by a medical expert in light
of the detective's "graphic and extremely prejudicial testimony
that 'lashes' and 'lines' could be seen on decedent's back,
running from decedent's buttocks to his shoulder." Petitioner
Mem. 26.

The State's unexplained failure to produce these
photographs to defense counsel prior to trial is troubling. See
Trial Tr. 301-02. However, as with the autopsy slides,
Petitioner's argument as to the materiality of the photographs

relies entirely on speculation. The photographs are therefore not Brady material.

### 3. Requests for Laboratory Analysis

Petitioner asserts that "[t]he People failed to provide the defense with any police department forms requesting analysis of carpet and pillow case samples taken from appellant's apartment . . . ." Petitioner Br. at 27. It is not clear from the record that any such forms existed, but if they did, Petitioner has not established the materiality of such forms.

## B. The Evidence of Guilt Was Legally Sufficient To Justify the Verdict

Petitioner next argues that the evidence of guilt was legally insufficient to establish Manslaughter in the First Degree under New York Penal Law § 125.20.

A petitioner challenging sufficiency of the evidence bears a "heavy burden." United States v. Gaskin, 364 F.3d 438, 459 (2d Cir. 2004). The relevant inquiry is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318

(1979). The question must be answered in the affirmative if

"after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." Id.

at 319 (emphasis in original); see United States v. Lewter, 402

F.3d 319, 321 (2d Cir. 2005).

In addition, because Taylor's petition was filed after

April 24, 1996, the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA") applies.  See Haims v. Senkowski, 114 Fed.

App'x 16, 17-18 (2d Cir. 2004).

> Under AEDPA, a federal court may grant habeas
> relief with respect to a constitutional challenge
> adjudicated on the merits in state court only if
> the state court's decision "was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the
> Supreme Court of the United States," 28 U.S.C. §
> 2254(d)(1) (2000), or "resulted in a decision
> that was based on an unreasonable determination
> of the facts in light of the evidence presented
> in the State court proceeding," 28 U.S.C. §
> 2254(d)(2) (2000).

Id. at 18.  Petitioner has failed to meet the standard

articulated by Jackson, let alone the higher bar set by AEDPA.

To evaluate the sufficiency of the evidence supporting

a state conviction, the Court looks to state law to determine

the elements of the crime.  Id.; Fama v. Comm'r of Corr. Servs.,

235 F.3d 804, 811 (2d Cir. 2000). Taylor was convicted of Manslaughter in the First Degree under New York Penal Law § 125.20(4), which requires that the prosecution prove beyond a reasonable doubt that "[b]eing eighteen years old or more and with intent to cause physical injury to a person less than eleven years old, the defendant recklessly engage[d] in conduct which creates a grave risk of serious physical injury to such person and thereby causes the death of such person." N.Y. Penal Law § 125.20(4) (McKinney 2004).

Petitioner's argument relies on assertions that the testimony of Clarisse Funderburk and Donna Pearman was "inherently unreliable" based on a number of inconsistencies, and that the medical evidence adduced at trial was insufficient to establish the occurrence of a homicide.

"[U]nder Jackson, the assessment of credibility of the witnesses is generally beyond the scope of review. . . . [T]he mere existence of sufficient evidence to convict would be determinative of petitioner's claim . . . ." Schlup v. Delo, 513 U.S. 298, 330 (1995); see also Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) ("[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's

assessment of both of these issues."); Grottola v. Hammock, 639 F.2d 922, 928 (2d Cir. 1981) ("The jury chose to believe the State's witnesses, despite the inconsistencies in the evidence and the character testimony. We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence.").

"A review of the record in the light most favorable to the prosecution" demonstrates that "a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt" of Manslaughter in the First Degree. Jackson, 443 U.S. at 324.

Clarisse Funderburk recounted her ordeal in considerable detail. The sum of her testimony, that Petitioner beat her and Pierre with a belt, was never seriously contradicted. Detective Pegram testified that Clarisse had relayed the incident to him immediately, and Clarisse's account was corroborated by Detective Pegram's testimony that he saw the imprint of belt marks on the girl and by medical evidence that Pierre's injuries were consistent with a belt beating. Dr. Schmuter asserted that the abrasions on Pierre's hip and head were consistent with a belt beating.

Clarisse also recalled peripheral details about the crime and the crime scene. She remembered that Petitioner's belt had a "gold goat" on it; when arrested the same day, Petitioner wore a belt with a ram's head buckle. While she did not remember the infant Roema, she recalled the crib in the other bedroom. Pearman testified that Roema slept in a playpen, in the same room as Clarisse and Pierre, only on occasion. Most of the time she slept in her crib in Pearman and Petitioner's bedroom. Clarisse testified that Petitioner wore only shorts and a t-shirt while inflicting the beating. Pearman confirmed that, when she left the house with Che Che that morning, Petitioner was wearing shorts and a t-shirt. Both Clarisse and Pearman recalled that Petitioner was seated in the dining area when Pearman returned from the nursery school, and that he left the apartment upon Pearman's return.

Pearman related the incident to Juanita Powell, who also testified about Petitioner's rush to leave the scene. Clarisse was aware that "Aunt Nita" was present when the police and ambulance arrived. The child also saw "blue stuff" on Pierre's body. According to Clarisse, Pierre was placed in his bed after the beating. Pearman discovered Pierre's body in his bed. Powell testified that her sister came out of Pierre's bedroom screaming that the child was not breathing. In short,

Clarisse's testimony was corroborated by Pearman and other prosecution witnesses.

Pearman's testimony that she fed Pierre cereal at 6:15 a.m. was never contested, and Dr. Schmuter confirmed the presence of food, consistent with cereal, in Pierre's stomach. The doctor also stated that the amount of digested food in the victim's stomach indicated that he ate approximately one hour, but no more than two hours, before he died. This would put the time of death somewhere between 7:15 and 8:15 a.m. Pearman left her apartment with Che Che at 7:25 a.m. and did not return until 9:00 a.m. Petitioner did not contest these facts at trial, but could have by calling any or all of the nursery school teachers as witnesses.

At most, Petitioner suggests that the evidence could be read to support a different conclusion. He has not established that no reasonable factfinder could have found the evidence sufficient to justify conviction.

## C. Taylor Did Not Exhaust State Remedies as to the Remaining Claims

Petitioner's final two claims are that he was entitled
to a circumstantial evidence charge and that his belt should not
have been admitted into evidence because no proper foundation
for its admission was established. Neither of these claims was
raised in Petitioner's application for leave to appeal to the
New York Court of Appeals. Respondent argues that Petitioner
has therefore failed to exhaust his state remedies. However,
Petitioner's failure to raise these claims in his application
renders them procedurally defaulted, not exhausted. See Brown
v. Senkowski, 152 Fed. App'x 15, 18-19 (2d Cir. 2005); Grey v.
Hoke, 933 F.2d 117, 120 (2d Cir. 1991). New York procedural
rules bar Petitioner from trying to raise his claims before the
Court of Appeals because he has already made the one request for
leave to appeal to which he is entitled. See Grey, 933 F.2d at
120; People v. Spence, 619 N.E.2d 644 (N.Y. 1993). Because
Petitioner no longer has "remedies available" in the state
courts, these claims are deemed exhausted pursuant to 28 U.S.C.
§ 2254(b). See Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.
1994); Grey, 933 F.2d at 120-21.

However, Petitioner's forfeiture in state court of
these claims bars him from litigating the merits of the claims
in federal habeas proceedings absent a showing of cause for the
procedural default and prejudice resulting therefrom, Murray v.

27

Carrier, 477 U.S. 478, 485 (1986); Brown, 152 Fed. App'x at 19,
or a showing that he is "actually innocent." Murray, at 496;
Brown, at 19. Petitioner has failed to even attempt such a
showing, and these claims are therefore barred.

**V. CONCLUSION**

For the above-stated reasons, the Petition is denied.

It is so ordered.

**New York, NY**
**October _/6_, 2008**

ROBERT W. SWEET
**U.S.D.J.**